UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:25-cr-64 |
| Plaintiff, | : | JUDGE: Cole |
| v. | : | INFORMATION |
| | : | 18 U.S.C. § 1343 |
| JOHN J. KERSEY, | : | FORFEITURE |
| Defendant. | : | |

THE UNITED STATES ATTORNEY CHARGES:

## COUNT 1
## (WIRE FRAUD)

At all times relevant:

1. The defendant, **JOHN J. KERSEY ("KERSEY")**, resided in the Southern District of Ohio.

2. **KERSEY** was a registered broker, investment adviser, and insurance agent. **KERSEY** had worked in financial industry for more than thirty-five years.

3. **KERSEY** worked for Company A for more than twenty years, as an agent. Company A prohibited **KERSEY** from serving as trustee or power of attorney for his clients.

### The Scheme to Defraud

4. Beginning in or about 2003 through 2023, in the Southern District of Ohio and elsewhere, the defendant, **JOHN J. KERSEY**, perpetrated a scheme to defraud his clients by soliciting millions of dollars for purported investments, then failing to invest client's funds as

promised, and misappropriating and converting client's funds to **KERSEY's** own benefit without the knowledge or authorization of his clients, using interstate wire communications to execute the scheme to defraud.

5. At times, **KERSEY** persuaded his clients to move their existing investments from Company A to purportedly invest in other funds or with other companies. By moving his clients' funds away from Company A, **KERSEY** concealed his scheme from Company A, and thus the visibility of his theft.

6. For example, **KERSEY** convinced some clients to move their investments out of Company A into a purported Guaranteed Investment Account (GIA) that would yield returns of 5-5.5%. To add legitimacy to the move, **KERSEY** provided his clients with a summary explaining how the GIA worked. According to **KERSEY**, the money would be divided into tranches, with each tranche invested in buffered notes that offered the promised yield and guaranteed the principal.

7. To effectuate the transfer, **KERSEY's** clients liquidated their investments with Company A, and transferred those funds to their bank accounts. **KERSEY** then instructed his clients to write personal checks to **KERSEY** for the new investments. To make his request appear more legitimate to the client, **KERSEY** instructed clients to write the word, "Trustee" after his name. However, **KERSEY** was not acting as a trustee; rather, he was stealing his clients' funds. **KERSEY** deposited the personal checks into accounts he controlled and did not invest his clients' funds as promised.

8. Other times, to effectuate the transfer of funds, **KERSEY** requested that clients provide him with signed blank checks so he could purportedly move the money from aggressive investment accounts to more conservative investment accounts. However,

**KERSEY** did not use the blank checks to invest client funds into other investments accounts; **KERSEY** filled out the checks and deposited them into his own account.

9. **KERSEY** kept his scheme afloat by persuading existing customers to continue to invest through him. For example, via telephone and text messages, **KERSEY** told existing clients about new investment opportunities. **KERSEY** created a false sense of urgency for these investments, telling clients that these opportunities were only available for a few days. **KERSEY** would follow his pitch with text messages containing wiring instructions – not to any investment or trustee account, but to his personal account. By wiring the money to directly to **KERSEY's** bank account, **KERSEY** concealed the transaction and his activities from Company A.

10. To induce current clients to keep investing, and thus conceal his fraudulent scheme, **KERSEY** told his clients that their investments were performing well. **KERSEY** created false documents that he would provide or show to his clients. For example, **KERSEY** gave clients fictious summaries purporting to depict their investments, or account balance statements with fictitious amounts and fake account numbers. At times **KERSEY** also fabricated charts and graphs to show clients their supposed investment gains. These documents were all false, as **KERSEY** had not invested the clients' money. Rather, he deposited his client's money into his own accounts.

11. **KERSEY** took more than $8 million from his clients. Rather than invest the money as promised, **KERSEY** deposited client's money in his personal account or in an account that benefitted **KERSEY**. **KERSEY** then used the money for his personal benefit to pay down credit card bills, pay insurance premiums and to provide a downpayment on real

3

estate. **KERSEY** also used the money to pay other clients, when required to do so in order to maintain his investment scheme.

### Execution of the Scheme to Defraud

On or about July 14, 2023, in the Southern District of Ohio, the defendant, **JOHN J. KERSEY**, for the purpose of executing the scheme to defraud described above, did knowingly cause the use of interstate wire transfer, to wit, the wiring of funds in the amount of $100,000 from the bank account of an investor to **KERSEY's** personal bank account, after **KERSEY** deposited the clients' check into his own personal bank account.

**All in violation of Title 18, United States Code, Sections 1343.**

### FORFEITURE ALLEGATION

Upon conviction of the offense set forth in Count 1 of this Information, the defendant, **JOHN J. KERSEY**, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violation, including but not limited to:

    a. Contents of Fidelity Brokerage, Account Number ending in 8559, in the name of John Albert Kersey and in the approximate amount of $100,000.00;

    b. Contents of Fifth Third Bank, Account Number ending in 9167, in the name of John A. Kersey and in the approximate amount of $6,218.82; and

    c. Contents of Wilmington Savings Bank, Account Number ending in 7823, in the name of John J. Kersey or Lynne M. Kersey and in the approximate amount of $4,167.43.

### SUBSTITUTE ASSETS

If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c.      has been placed beyond the jurisdiction of the court;

    d.      has been substantially diminished in value; or

    e.      has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant, up to the value of the property described above.

            KELLY A. NORRIS
            ACTING UNITED STATES ATTORNEY

            *Emily M. Glatfelter*
            EMILY N. GLATFELTER
            ASSISTANT UNITED STATES ATTORNEY